**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

| | |
|---|---|
| IN RE CIVIL INVESTIGATIVE DEMAND NOS. 26-519, 26-544, 26-545, 26-546, 26-547, AND 26-548 | CASE NO. _____ <br><br> **PETITION TO SET ASIDE CIVIL INVESTIGATIVE DEMANDS** |

## INTRODUCTION

Every *qui tam* case filed under the False Claims Act ("FCA" or the "Act") reaches a critical and pivotal moment—the moment the Government elects to intervene and take over the case or to decline to intervene and allow the relator to pursue the case. 31 U.S.C. § 3730(b)(4)(A) and (B). The structure of the FCA and the investigative powers granted to the Government under the statute create a definite divide between "before intervention decision" and "after intervention decision." After the intervention decision the Government's investigation powers cease and the case like any other litigation is subject to the Federal Rules of Civil Procedure. Here, the Government seeks to improperly extend its significant investigatory powers beyond the scope of the statute and the rationale that justifies the use of Civil Investigative Demands ("CIDs"). Allowing this would make a mockery of the FCA's carefully balanced framework, burden the litigants with double and in many cases inconsistent production obligations, and would be contrary to the plain language of the FCA.

Petitioners SBK Capital, LLC ("SBK Capital"), the Estate of Samuel B. Kellett (the "Estate"), Clear Choice Health Care, LLC ("Clear Choice"), SBK, L.L.C. ("SBK"), SAK, JR., L.L.C. ("SAK JR"), and Kellett Family Partners, L.P. ("KFP") respectfully petition this Court to set aside CID Nos. 26-519, 26-544, 26-545, 26-546, 26-547, and 26-548 in their entirety pursuant to 31 U.S.C. § 3733(j)(2). The Court should set aside the CIDs because: 1) the Department of Justice ("DOJ") is without statutory authority to issue and serve CIDs after it has made its intervention decision in this case; 2) demanding production of voluminous information after the intervention decision is made is abuse of the CID authority, which is meant to allow the Government to investigate and decided whether or not to intervene in a *qui tam* suit; and 3) the underlying *qui tam* will now proceed forcing the defendants to both litigate and engage in discovery with relators under the federal rules, while complying with onerous production demands from the Government at the same time.

The Government had nearly a year and a half to investigate the allegations in the *qui tam* complaint, but waited until ***after*** its long-extended intervention deadline to serve CIDs on Petitioners.  The plain language of the FCA, the clear purpose of CID authority, and the burden of complying with two regimes of document discovery, prohibit the Government's improper investigation.

**PETITIONERS**

SBK Capital, SBK, SAK JR, and KFP are investment companies that hold ownership interest in a variety of fields, including in skilled nursing facilities ("SNFs"). Clear Choice manages SNFs. Samuel B. Kellett ("Sam Kellett") held ownership interests in SBK Capital, SBK, and Clear Choice, until he died on December 1, 2022, at which point those interests passed through the Estate to a trust.

**BACKGROUND**

The underlying *qui tam* action involves several SNFs, most of which operate in Florida, including in this district. The SNFs received loans under the Small Business Administration's ("SBA") Paycheck Protection Program ("PPP"), a COVID-era assistance program. In December 2024, a data miner, Integrity Analytics LLC (the "data miner") cobbled together publicly available information and filed a *qui tam* action rife with factual and legal inaccuracies. In its initial Complaint (ECF 1), the data miner alleged that eight SNFs and Clear Choice were ineligible for PPP loans because they exceeded the PPP's size limitations when taken together as "affiliates" under the SBA's affiliation rules. By its Second Amended Complaint (ECF 11), the data miner added two additional SNF entities and SBK Capital to the purported affiliate group. It also added four "Doe" individual defendants. *Id.*

PPP eligibility is not the issue here.[1]  The issue is whether the Government can issue CIDs in clear violation of the law, and extend its investigation beyond the time allowed by the FCA and by this Court's orders.

The Government had 17 months to investigate the allegations in the *qui tam* complaint.  It did not.  The Government did not contact the *qui tam* Defendants for over a year after the complaint was filed.  Even at that point, the Government did not issue CIDs.  Instead, it sent a series of letters dated December 22, 2025, inviting the entities named in the *qui tam* to engage in a dialogue, saying the Government "would like to arrange a time to discuss our investigation with you in January 2026."

The entities did just that.  Undersigned counsel promptly reached out to the Government in January and began voluntarily producing documents pursuant to the Government's request.  In a little over two months, counsel made four productions consisting of 6,356 pages of documents.  This included operating and partnership agreements, corporate governance documents, financial records, tax documents, organizational charts, and other documentation across 26 entities.  Throughout this process, the Government frequently noted that it was under a compressed timetable.

---

[1] While avoiding the urge to refute the data miner's inaccurate claims, the borrowers are eligible for their PPP loans.  The PPP borrowers made significant disclosures of commonly owned entities in their applications.  The SBA approved all of the subject loans. One entity even responded to a detailed inquiry from the SBA during the forgiveness process, providing additional documentation and rationale for eligibility.  After which, all loans were forgiven.

The entities cooperated accordingly, working swiftly to make all requested information available to the Government—while under no obligation to do so.

The timeline revealed in the now unsealed *qui tam* docket, highlights the failure to investigate this matter that has led the Government to this point. It appears that just four days before the Government's initial outreach to the entities, the Government obtained a third seal extension. (ECF 17). Government motions seeking additional time to make an intervention decision typically update the Court on investigative steps taken to that point. While that motion is still sealed, it is clear from the Court's corresponding order that the investigation was deficient. The Court noted that the action had "been pending for more than a year." *Id.* at 1. Further, the Government's prior request for an extension in August 2025, had been made "[w]ithout showing due diligence to that point[.]" *Id.* In December 2025, the Court again noted that the Government had "not shown diligence in its handling of the matter to this point" and "the file apparently has lain dormant for long stretches[.]" *Id.* at 2. The Government first contacted the targets of its investigation seeking voluntary productions only *after* this order.

In line with the Government's frequent refrain to counsel, it was indeed under a tight timetable. The Court extended the Government's time to make an intervention decision to April 20, 2026—less than the six months requested—with the warning that "[t]he deadline will not be extended again." *Id.*

5

The entities' voluntary cooperation was not limited to its voluminous productions. On April 1, 2026—19 days before the Government's deadline—counsel met with the Government for several hours and gave a detailed report on the entities and their eligibility for PPP loans, subject to Fed. R. Evid. 408.

Without addressing the entities' arguments, on April 13, 2026—just a week before its deadline—the Government asked counsel if they would accept service of four CIDs.[2] Counsel declined to accept service, challenging the validity of the eleventh-hour CIDs and noting the entities had cooperated and produced voluminous documents voluntarily since first contacted about this case in January 2026. On multiple occasions, counsel offered to continue its voluntary production. It offered various forms of additional underlying documentation, and provided a copy of the entities' presentation to the Government, on April 17, 2026. Then the Government went silent.

The Government's April 20, 2026 intervention deadline came and went without any communication. With the docket sealed, the entities were not aware that the Government had asked for a fourth seal extension (ECF 20), which was granted in part, extending the deadline marginally to May 4, 2026. (ECF 21). Setting the Government's ultimate deadline, the Court noted that the Government had "only

---

[2] The Government asked if counsel would accept CIDs on behalf of SBK Capital, the Estate, Clear Choice, and SBK. The Government also asked if counsel represented SAK JR and KFP, ostensibly to request counsel accept service of additional CIDs.

recently begun to do what it should have done more than a year ago." *Id.* Only then, during its brief two-week extension (and 16 months after the *qui tam* was filed), did the Government issue CIDs, which were signed on April 29, 2026.[3]

The CIDs are very broad. They call for extensive document productions, interrogatory responses, and testimony from company representatives. Document Request No. 1 of each CID contains 14 subsections, requesting different forms of documents for 56 separate legal entities, trusts, and individuals listed on a separate attachment. The most pertinent documents to the eligibility analysis (a small subset of the documents requested by the CID) were already voluntarily produced before the Government's intervention decision. These included tax returns, profit and loss statements, organizational charts, governance documents, and management agreements.

The interrogatories are equally expansive. For example, Interrogatory No. 1 of each CID contains 11 subsections seeking identification of information, again for 56 separate legal entities, trusts, and individuals. As with the document requests, the most pertinent information requested in the interrogatories (again, a mere fraction of what the CIDs seek) was already provided by counsel well before the Government's intervention deadline, including financial and ownership data. The CIDs go well

---

[3] The CIDs were issued as follows: CID No. 26-519 to SBK Capital; CID No. 26-544 to the Estate; CID No. 26-545 to Clear Choice; CID No. 26-546 to SBK; CID No. 26-547 to SAK JR; and CID No. 26-548 to KFP.

beyond.  The CIDs go on to request oral testimony on all of these topics.  Notably, the six CIDs are identical, requesting the same information from each of the Petitioners, without regard for who the correct custodian is.

Despite these expansive, often duplicative requests, on May 4, 2026, the Government declined to intervene, just 5 days after issuing the CIDs. (ECF 22) (sealed); *see also* (ECF 23) (noting the Government's election not to intervene).

The Government's service delay is fatal.  None of the CIDs were served before the Government declined to intervene.  CIDs to SBK Capital, SBK, and the Estate were delivered on May 5, 2026—a day after the Government declined.  SAK JR and KFP received copies of their CIDs on May 13, 2026—nine days after the Government declined.  Clear Choice was never served.  Regardless of the actual delivery dates, on May 19, 2026, the Government conceded that five of the CIDs were delivered on May 5, 2024 (after declination) and that the Clear Choice CID remained in transit.

### **STATUTORY FRAMEWORK**

FCA actions can be initiated by the Government or by a private individual, known as a *qui tam* relator.  31 U.S.C. § 3730(a) and (b)(1).  When a relator brings an action on behalf of the Government, the complaint is filed in camera and remains under seal for at least 60 days, allowing the Government time to investigate the claims and determine whether it will intervene.  *See* 31 U.S.C. § 3730(b)(2).  During

this initial investigative phase, the Government "may, for good cause shown," move for extensions of the time to develop its investigation. *See* 31 U.S.C. § 3730(b)(3). Also, during the investigative phase, the Government may issue CIDs to collect "information relevant to a false claims law investigation[.]" 31 U.S.C. § 3733(a)(1).

The same statute that grants the Government authority to issue CIDs in certain instances also allows CID-recipients to challenge those demands. Relief "may be based upon any failure of the demand to comply with the provisions of [§ 3733] or upon any constitutional or other legal right or privilege of such person." 31 U.S.C. § 3733(j)(2)(B).

While CIDs are one of the Government's most powerful tools to investigate and enforce the FCA, that CID authority is not absolute. The FCA expressly limits when the Government can utilize this tool: "***before*** commencing a civil proceeding under section 3730(a) or other false claims law, or ***making an election*** under section 3730(b)," the Government may "issue in writing ***and cause to be served*** upon such person, a civil investigative demand[.]" 31 U.S.C. § 3733(a)(1) (emphasis added).

### ARGUMENT

**A.     The Government Did Not Comply with Statutory Requirements to Serve a Valid CID—These CIDs are Illegal and Unenforceable.**

The Government now has no authority to serve CIDs. Its authority is established and limited by statute and terminated when it declined intervention in the underlying *qui tam* matter, *United States ex rel. Integrity Analytics LLC v. Centre*

*Pointe HRC LLC et al.* (N.D. Fl. Case No. 4:24cv489-RH-MAF).  The statute's grant of CID authority is clear: "***before*** . . . ***making an election under section 3730(b)***," the Government may "issue in writing and cause to be ***served*** upon such person, a civil investigative demand[.]"  31 U.S.C. § 3733(a)(1) (emphasis added).  Under the plain language of the statute, the Government must issue ***and serve*** CIDs before it makes an intervention decision.  It did not.  Thus, the CIDs are unlawful.

Courts have held to this plain reading of the statute.  *See United States v. Cross Senior Care, Inc*., LLC, No. 8:19-MC-8-T-33TGW, 2019 WL 11502849, at *4 (M.D. Fla. Nov. 6, 2019), *report and recommendation adopted*, No. 8:19-MC-008-T-33TGW, 2019 WL 11502798 (M.D. Fla. Dec. 18, 2019), *aff'd*, 831 F. App'x 944 (11th Cir. 2020) ("The government complied with § 3733(a)(1).  It issued ***and served*** the CID in December 2017, more than one year ***before it made an election*** on whether to intervene in the . . . case.") (emphasis added).

In *Cross Senior Care*, the Government issued and served a CID over a year before the intervention decision.  *Id.* at *1.  During production, a dispute arose as to the relevance and responsiveness of some emails.  *Id.* at *2.  The Government—prior to its intervention deadline—filed a petition to enforce the CID and the Court ordered Cross Senior Care to file a written response and appear at a show cause hearing.  *Id.*  Before that hearing was held, the Government declined to intervene in the *qui tam*.  *Id.*

10

Cross Senior Care argued that the Government's ability to *enforce* a CID terminated when it declined to intervene. *Id.* at *3. The Court rejected that argument, first by noting that the Government complied with the requirements of 31 U.S.C. § 3733(a)(1) when it "issued and served the CID . . . before it made an election on whether to intervene[.]" *Id.* at *4. The Court then noted that the statutory provision allowing the Government to file a petition to enforce a valid CID "does not contain a limitation on the government's filing of, or the court's jurisdiction to adjudicate, a petition for enforcement." *Id.* The Court specifically noted that § 3733(a)(1) does limit the Government's ability to issue and serve CIDs after an intervention decision. *Id.* at *4 ("The respondent's argument essentially takes a limitation in § 3733(a)(1) and adds it to § 3733(j)(1).").

The CIDs at issue violate the statutory limitation on when the Government can issue and serve CIDs. The Government did not serve the CIDs before its election not to intervene. Unlike the CID in *Cross Senior Care*, which was served well over a year before the Government declined intervention, these CIDs were issued mere days before, and served only *after*, the Government declined intervention.

Courts have similarly construed the other CID cut off in § 3733(a)(1): commencement of an FCA action by the Government. *See United States v. Kernan Hosp.*, No. CIV.A. RDB-11-2961, 2012 WL 5879133 (D. Md. Nov. 20, 2012); *see also Avco Corp. v. U.S. Dep't of Just.*, 884 F.2d 621, 623 (D.C. Cir. 1989) ("[I]t is

11

evident to anyone reading the statute—that the Attorney General may not employ the power granted by [§ 3733(a)(1)] after he has commenced a false claims action.")

In *Kernan Hosp.*, the Government proceeded in the normal order of operations. After years of pre-litigation administrative subpoenas and a CID, the Government filed an FCA complaint. *Kernan Hosp.*, 2012 WL 5879133 at *1–2. That complaint, however, was dismissed without prejudice as the Government failed to adequately plead fraud. *Id.* at *2. After the dismissal, the Government issued a second CID involving the same subject matter. *Id.* Analyzing the language of § 3733(a)(1) and its legislative history, the Court held that the Government could not issue a new CID after filing a lawsuit against the hospital. *Id.* at *5. Although, this case involves an intervention decision as opposed to the commencement of a lawsuit, the exact same limitation in § 3733(a)(1) applies.

The Government only has CID power if it comports with the relevant statutory grant of authority. The CIDs here were purportedly authorized under § 3733(a)(1). Yet the Government exceeded its grant of authority and illegally served the CIDs after it declined intervention. The CIDs are invalid and must be set aside in their entirety.

**B. CIDs are Pre-Intervention Investigative Tools to Inform the Government's Intervention Decision—That Purpose Ceases to Exist After an Intervention Decision.**

A CID requesting documents that cannot possibly be used to inform the Government's intervention decision is contrary to the express purposes of the CID authority in the FCA. The Government is given CID authority to investigate a case and decide whether or not to intervene. "This investigative tool provides the government 'with a means *to assess . . . whether grounds exist for initiating* a false claim suit.'" *Kernan Hosp.*, 2012 WL 5879133 at *3 (quoting *United States v. Markwood*, 48 F.3d 969, 979 (6th Cir. 1995)) (emphasis added). Once the Government—as it has here—makes an election, the purpose of a CID is extinguished.

Unlike typical civil litigation, FCA actions are divided into two distinct phases: 1) a pre-litigation investigation and 2) active litigation. This distinction is clear across the Act. The FCA defines the Government's responsibility in these two distinct phases. First, the Government "diligently shall investigate" the allegations. 31 U.S.C. § 3730(a). Second, and only "[i]f the Attorney General finds that a person has violated or is violating [the FCA], the Attorney General may bring a civil action[.]" *Id.* The Government investigates, then litigates if it deems the allegations meritorious.

13

This two-phased approach appears again when an FCA action is initiated by a *qui tam* relator. The complaint is filed in camera and under seal for at least 60 days, allowing the Government to investigate and determine whether it will intervene. *See* 31 U.S.C. § 3730(b)(2). During this phase, the Government "may, for good cause shown," move for extensions of the time to further its investigation. *See* 31 U.S.C. § 3730(b)(3). Here, the Government moved for extensions on four different occasions.

After that investigative phase ends, either the Government intervenes and prosecutes the case, or the *qui tam* relator prosecutes the case on the Government's behalf. *See* 31 U.S.C. § 3730(b)(4)(A) and (B).

A CID is a tool of the investigative phase, while typical civil discovery is a tool of the litigation phase. When the Government makes its intervention decision, the CID "Rubicon is crossed[.]" *Avco Corp.*, 884 F.2d at 624. "Congress circumscribed the period during which the Government could issue [CIDs] to the prefiling stage, it did not mean to provide the Government with that power at any time[.]" *Kernan Hosp.*, 2012 WL 5879133 at *5 (citing H.R.Rep. No. 99–660, at 26 (1986)). "At the prefiling stage, the Government is able to gather the information it needs 'to determine whether enough evidence existed to warrant the expense of filing suit.'" *Id.* (quoting H.R.Rep. No. 99–660, at 26 (1986)). "Congress created [CIDs] to aid the Government in deciding whether to file suit in the first place." *Id.*

Once that decision is made, as it was here, "the civil investigative demand no longer serves its purpose as expressed in the legislative history." *Id.*[4]

The Government—across four extensions of time—had ample opportunity to make its intervention decision. It could have timely issued and served CIDs to inform that decision. It did not. If information is needed now, it is for the purposes of litigation (*i.e.*, reciprocal discovery), not intervention decision making (*i.e.*, CIDs). With its declination to intervene, that litigation fact gathering on behalf of the Government falls to the relator, not the Government itself. "[I]f the United States declines to intervene, the relator may proceed with the action alone on behalf of the government, but the United States is not a party to the action." *United States ex rel. Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081, 1087 (11th Cir. 2018), *aff'd*, 587 U.S. 262 (2019) (citing 31 U.S.C. § 3730(c)(3)).

---

[4] While some of this case law focuses on the filing of a complaint (ostensibly either the Government's complaint in intervention, or a relator proceeding under his own complaint after a declination), *Avco Corp.* makes it clear that the operative dividing line between the investigative CID stage and the litigation stage is the intervention decision:

> In the present case, the Attorney General has not used the CID power after intervention; indeed, he has not intervened. The Department of Justice concedes that the word "commencing" should be construed illiterally to encompass "intervening." If some future Attorney General should disagree with this interpretation and attempt to issue a CID after intervening in and taking control of a *qui tam* proceeding under section 3730(b)(4)(A), it is not unlikely that we would reject that new interpretation, but we need not decide that hypothetical.

*Avco Corp.*, 884 F.2d at 624.

The Government no longer has a proper use for CIDs, as it made its decision not to intervene. Now, it is not a party to the action, the remaining parties alone may conduct reciprocal discovery.

**C.    Defendants Would be Forced to Respond to the Pending Lawsuit and Continue to Comply with Investigative Demands from the Government.**

CIDs are typically issued early in an investigation, shortly after a *qui tam* is filed. Here, the Government effectively seeks to **start** its investigation **after** it has declined to intervene. Defendants will thus be forced to comply with onerous production demands from the Government while engaged in civil litigation with the relator. The FCA's limitation on CIDs to pre-intervention investigation avoids this perverse result.

Now that the Government has declined to intervene, the relator is free to serve its Second Amended Complaint and prosecute the action. *See* 31 U.S.C. § 3730(c)(3). By attempting to issue and serve CIDs during the litigation phase, the Government—if allowed to continue down this road—would force Petitioners and the other entities named in the *qui tam* to wage a war on two fronts. On one hand, they would face typical civil litigation with the relator, engaging in motions to dismiss, discovery, motions for summary judgment, and potentially all the way to trial. On the second front, they would simultaneously be engaged in defending the Government's long extended investigation, conducting extensive document reviews

16

and productions, answering interrogatories, defending depositions, and making further declination presentations to the Government.

If the Government is allowed to continue its investigation parallel to active litigation by the relator, it is also possible that it could intervene, file its own complaint, and reset the case to genesis. *See* 31 U.S.C. § 3730(c)(3) ("When a [relator] proceeds with the action, the court . . . may nevertheless permit the Government to intervene at a later date upon a showing of good cause."). This reset could occur even after relator and the *qui tam* defendants significantly advance the case—at great cost to their own resources and the Court's—all to begin again.

This anomalous litigation track is precisely why CIDs are statutorily time limited by 31 U.S.C. § 3733(a)(1) to the pre-litigation, investigative phase. Once the Government declines, it is not a party to the action. *United States ex rel. Hunt*, 887 F.3d at 1087 (citing 31 U.S.C. § 3730(c)(3)). And, while it may seek to intervene at a later date, the Act makes clear what new information (as a non-party) the Government is afforded that may change its intervention decision—and it is not a CID parallel to relator's litigation. 31 U.S.C. § 3730(c)(3) ("If the Government so requests, it shall be served with copies of all pleadings filed in the action and shall be supplied with copies of all deposition transcripts (at the Government's expense)."). At this juncture, the Government has made its election—it is not a party

and must leave the case to the relator. While it can change its decision, new information now flows only from litigation in which the Government may observe.

## PRAYER FOR RELIEF

**WHEREFORE**, Petitioners respectfully requests this Court issue an Order setting aside the unlawful CIDs in their entirety, pursuant to 31 U.S.C. § 3733(j)(2). Petitioners also respectfully request that the Court stay Petitioners' time to respond to the CIDs during the pendency of this Petition, pursuant to 31 U.S.C. § 3733(j)(2)(b). Petitioners timely filed this Petition and have caused a copy of this Petition to be served upon the false claims law investigators identified in the CIDs as required by 31 U.S.C. § 3733(j)(2).

Respectfully submitted, this the 22nd day of May, 2026,

BRADLEY ARANT BOULT CUMMINGS LLP

*/s/ Elizabeth F. Greene*

Elizabeth F. Greene (N.C. 26730), *pro hac pending*
Jonathan H. Ferry (N.C. 28202), *pro hac pending*
Gavin A. Bell (N.C. 54759), *pro hac pending*
214 North Tryon Street, Suite 3700
Charlotte, North Carolina 28202
(704) 338-6013
bgreene@bradley.com
jferry@bradley.com
gabell@bradley.com

*Counsel for Petitioners*

18